IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

CRYSTAL LEA DIMICK,

        Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,[1]

        Defendant.

No. C12-1018

RULING ON JUDICIAL REVIEW

---

## TABLE OF CONTENTS

I.    *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   *PROCEDURAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  *PRINCIPLES OF REVIEW* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.  *FACTS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    A.    *Dimick's Education and Employment Background* . . . . . . . . . . . . 5
    B.    *Administrative Hearing Testimony* . . . . . . . . . . . . . . . . . . . . . . 7
        1.    *Dimick's Testimony* . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        2.    *Vocational Expert's Testimony* . . . . . . . . . . . . . . . . . . . 10
    C.    *Dimick's Medical History* . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

V.   *CONCLUSIONS OF LAW* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    A.    *ALJ's Disability Determination* . . . . . . . . . . . . . . . . . . . . . . . 17
    B.    *Objections Raised By Claimant* . . . . . . . . . . . . . . . . . . . . . . . 19
        1.    *Medical Records, Medical Opinions, and RFC Assessment* . . 19
        2.    *Credibility Determination* . . . . . . . . . . . . . . . . . . . . . . 24

---

[1] Plaintiff originally filed this case against Michael J. Astrue, the Commissioner of Social Security Administration ("SSA"). On February 14, 2013, Carolyn W. Colvin became Commissioner of the SSA. The Court, therefore, substitutes Commissioner Colvin as the Defendant in this action. FED. R. CIV. P. 25(d)(1).

*VI.  CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*VII.  ORDER* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

## I.  INTRODUCTION

This matter comes before the Court on the Complaint (docket number 4) filed by Plaintiff Crystal Lea Dimick on July 6, 2012, requesting judicial review of the Social Security Commissioner's decision to deny her applications for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits. Dimick asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide her disability insurance benefits and SSI benefits. In the alternative, Dimick requests the Court to remand this matter for further proceedings.

## II.  PROCEDURAL BACKGROUND

On November 7, 2008, Dimick applied for both disability insurance benefits and SSI benefits.[2] In her applications, Dimick alleged an inability to work since July 1, 2001 due to ulcerative colitis and depression.[3] Dimick's applications were denied on February 27, 2009. On May 8, 2009, her applications were denied on reconsideration. On August 5, 2009, Dimick requested an administrative hearing before an Administrative Law Judge ("ALJ"). On January 5, 2011, Dimick appeared via video conference with her attorney

---

[2] Prior to her 2008 applications, Dimick applied for both disability benefits and SSI benefits on December 8, 2006. Both applications were denied on April 17, 2007. Dimick neither sought reconsideration, nor appealed the denial of her 2006 applications.

[3] At the administrative hearing, Dimick amended her disability onset date to January 14, 2005. *See* Administrative Record at 15, 59; *see also* Dimick's Brief (docket number 12) at 3 (providing that Dimick voluntarily amended her disability onset date at the administrative hearing).

2

before ALJ John E. Sandbothe for an administrative hearing.[4] Dimick and vocational expert Jeff L. Johnson testified at the hearing. In a decision dated January 21, 2011, the ALJ denied Dimick's claims. The ALJ determined that Dimick was not disabled and not entitled to disability insurance benefits or SSI benefits because she was functionally capable of performing work that exists in significant numbers in the national economy. Dimick appealed the ALJ's decision. On May 7, 2012, the Appeals Council denied Dimick's request for review. Consequently, the ALJ's January 21, 2011 decision was adopted as the Commissioner's final decision.

On July 6, 2012, Dimick filed this action for judicial review. The Commissioner filed an Answer on September 10, 2012. On October 11, 2012, Dimick filed a brief arguing that there is not substantial evidence in the record to support the ALJ's finding that she is not disabled and that she is functionally capable of performing work that exists in significant numbers in the national economy. On December 10, 2012, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On December 19, 2012, Dimick filed a reply brief. On September 21, 2012, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

### III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g).

---

[4] On October 28, 2010, Dimick appeared without representation before ALJ Sandbothe for her administrative hearing. However, after conferring with the ALJ, Dimick decided to hire an attorney, and her hearing was continued to January 5, 2011.

3

42 U.S.C. § 1383(c)(3). Title 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the Commissioner's decision if supported by substantial evidence on the record as a whole." *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (citation omitted). Substantial evidence is defined as "'less than a preponderance but . . . enough that a reasonable mind would find it adequate to support the conclusion.'" *Id.* (quoting *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010)); *see also Brock v. Astrue*, 674 F.3d 1062, 1063 (8th Cir. 2010) ("Substantial evidence is evidence that a reasonable person might accept as adequate to support a decision but is less than a preponderance.").

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

4

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Buckner v. Astrue*, 646 F.3d 549 (8th Cir. 2011), the Eighth Circuit further explained that a court "'will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 556 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "'An ALJ's decision is not outside that zone of choice simply because [a court] might have reached a different conclusion had [the court] been the initial finder of fact.'" *Id.* Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## IV. FACTS

### A. Dimick's Education and Employment Background

Dimick was born in 1984. She is a high school graduate and attended college into her sophmore year. At the administrative hearing, Dimick's attorney questioned Dimick about her time in college:

> Q:    . . . Why did you stop going to school?
> A:    Because of my health. . . .
> Q:    And you were at the University of Iowa?
> A:    Yes.

5

| Q: | . . . It looks like the spring of '05 semester was the last semester you were enrolled; is that right?[5] |
|---|---|
| A: | Yes. |
| Q: | And did you finish that semester? |
| A: | No. I withdrew. I left in March. |

(Administrative Record at 41-42.)

The record contains a detailed earnings report for Dimick. The report covers the time period of 1999 to 2009. From 1999 to 2008, Dimick earned between $285.25 (2007) and $4,830.49 (2002). According to the report, Dimick had no earnings in 2009. However, in a subsequent report, Dimick showed earnings of $3,273.00 in the fourth quarter of 2009 at ABC Learning Center, in Dubuque, Iowa. According to the report, Dimick continued to work at ABC Learning Center in 2010. In early 2011, at the administrative hearing, Dimick's attorney and Dimick had the following conversation regarding her employment:

| Q: | . . . Are you working right now? |
|---|---|
| A: | Yes. |
| Q: | What [d]o you do? |
| A: | I work as a preschool teacher. |
| Q: | And let's just talk about the amount of time that you would be scheduled or you'd be able to work if you didn't have the health problems. Would that be a full-time job? |
| A: | Yes. |
| Q: | Okay. Right now, currently, if you had to average it, how many hours in a week are you averaging to work? |
| A: | About twenty. |
| Q: | Okay. And has that been fairly consistent over the last, say, six months? |
| A: | No. |

---

[5] Other evidence in the record suggests that Dimick left school in the fall of 2006. *See* Administrative Record at 484.

Q:    And what's the low end of how many hours you work
      in a week?
A:    Eight.
Q:    Okay.  And how about in the high end?
A:    Around 32.

(Administrative Record at 42-43.)

### B.  Administrative Hearing Testimony

### 1.    Dimick's Testimony

At the administrative hearing, Dimick's attorney asked Dimick to discuss her difficulties with ulcerative colitis.  Dimick explained that in late 2004, she was "really" sick, and was diagnosed in January 2005 with ulcerative colitis.  At its worst, Dimick stated that she was having approximately 60 stools in a 24-hour period.  To treat the colitis, Dimick was started on Remicade treatment, every six to seven weeks.[6]  According to Dimick, as the Remicade starts to wear off prior to the next treatment, her colitis begins to "flare-up."  Dimick described a flare-up as follows:  "[When a f]lare-up [occurs], I'm having diarrhea probably up to ten times an hour, having blood hemorrhaging with the diarrhea.  I'm having the really severe cramping and just exhausted."[7]  Dimick indicated that she has flare-ups about once per month, and they last from two days to one week.  Dimick further testified that other symptoms associated with a flare-up, include feeling nauseous from the pain and migraine headaches.

---

[6] Remicade is a drug used to treat moderate Crohn's disease and ulcerative colitis. The drug blocks TNF-alpha, a natural substance made by certain blood cells.  Too much TNF-alpha can cause an individual's immune system to attack healthy tissues and cause inflammation.  Remicade reduces such inflammation.  A side effect of Remicade is a reduction of an individual's immune system and the ability to fight infection.

[7] Administrative Record at 50.

7

Dimick's attorney also questioned Dimick regarding the side effects of Remicade treatments:

> Q:    Now, you've talked -- you use the term 'secondary infection'.
>
> A:    Yes.
>
> Q:    And that's in your medical records. Why don't you explain to the judge what you're talking about there.
>
> A:    I'm catching viruses, different bacterial infections, pneumonia, bronchitis, sinusitis, eye infections. Pretty much any common virus I catch.
>
> Q:    And your understanding is that's because of the effect Remicade has on your immune system?
>
> A:    Right, the immunosuppressants.
>
> Q:    How often do you think you have what you call a secondary infection?
>
> A:    Every two weeks.
>
> Q:    And how often are they bad enough, those infections bad enough to interfere with your ability to go into work?
>
> A:    Pretty often. In the last six weeks alone, I've missed 80 percent of my scheduled hours just from bronchitis and sinus infections and flare-ups. . . .
>
> Q:    Okay. What if we looked at like the last six months to a year?
>
> A:    I --
>
> Q:    How often are you having these?
>
> A:    Every couple of weeks, I'm missing a day or two and sometimes half days.
>
> Q:    And that's just because of the infections. That's not because of the flare-ups, if I understand you right?
>
> A:    Yes.

(Administrative Record at 52-53.) Additionally, Dimick's attorney asked Dimick to describe her colitis when not experiencing flare-ups. Dimick explained that "all bowel movements are diarrhea. Always. But there's sometimes it's more frequent, and usually

8

when it it's normal, I'm going four five times a day rather than 10 to 20, and there's no hemorrhaging. That would be normal."[8]

Dimick's attorney also asked Dimick to discuss her difficulties with migraine headaches:

> Q: You also mentioned migraines or headaches.
> A: Right.
> Q: Do those correspond to your other symptoms, or when do those come around?
> A: It depends. Sometimes they are because of my other symptoms. If I get a really bad flare-up, I get a migraine. Other times, I just can get them from anxiety and other things. And when I get them, my head pounds so bad that I usually throw up. I have to go up to the hospital and get injections.
> Q: Right now, you know, again over the last say six months to a year, how often are you having [] a headache that's really bad enough to, you know, require you to -- that would interfere with your ability to go to work?
> A: I would say a couple times a month.
> Q: Okay. And when you have one of these headaches, how long does it typically last?
> A: It can last anywhere from a few hours to a couple days.
> Q: And what do you need to do to relieve it? You mentioned going, getting some medication. What else do you have to do?
> A: I usually have to get medication and then just be in a dark, silent room.
> Q: So, is there any question as to whether or not you'd be able to stay at work if one of those came on?
> A: Oh, no. I usually end up getting very nauseous and vomiting. Sometimes I get real dizzy with them. So, no, I can't stay at work.

(Administrative Record at 53-54.)

---

[8] Administrative Record at 56.

### 2. *Vocational Expert's Testimony*

At the hearing, the ALJ provided vocational expert Jeff L. Johnson with a hypothetical for an individual who:

> could lift 20 pounds occasionally, 10 pounds frequently. She could only occasionally balance, stoop, crouch, kneel, crawl, or climb. She would need consistent access to a bathroom. No hazards. No extremes of humidity, dust, or fumes.

(Administrative Record at 61.) The vocational expert testified that under such limitations, Dimick could work at a "full-range of light and sedentary work activities at the unskilled level."[9] The ALJ asked the vocational expert a second hypothetical question that was identical to the first hypothetical question, except it included an additional limitation that the individual would have two or more unscheduled breaks per day, and two or more absences from work each month. The vocational expert stated that under such limitations, Dimick would be precluded from competitive employment.

### C. *Dimick's Medical History*

On January 14, 2005, Dimick met with Dr. Osamah El Khatib, M.D., complaining of abdominal pain and bloody stool for the past three months. Dimick reported "almost" 60 stools in the last 24 hours. Dr. El Khatib opined that Dimick "could" have inflammatory bowel disease. On February 7, 2005, Dimick again met with Dr. El Khatib for a follow-up appointment. Dr. El Khatib noted that:

> On January 21, 2005, she was found to have an unspecified universal colitis of moderate severity, likely consistent with primary ulcerative colitis. Biopsies confirmed this diagnosis. She was placed on PREDNISONE 30 mg a day and now presents stating that her symptoms have vastly improved. Her stools still may be a little bit loose. Every other day she might have a little bit more frequent stool, but her abdominal pain and bleeding have essentially resolved. . . . The

---

[9] Administrative Record at 61.

> PREDNISONE has made it difficult for her to sleep and she
> has been moody, but all in all she is much better.

(Administrative Record at 418.) On March 21, 2005, Dimick returned to Dr. El Khatib for follow-up on her ulcerative colitis. Dr. El Khatib noted that Dimick stopped taking Prednisone on her own due to accelerated bleeding, but "feels completely normal."[10] Upon examination, Dr. El Khatib concluded that Dimick "is currently in remission. She is on maintenance dose of SULFASALAZINE and feels entirely well. She will remain indefinitely on her current maintenance dose."[11]

By August 2005, Dimick's difficulties with ulcerative colitis had returned, and she was taking 40 mg of Prednisone on a daily basis. On August 22, 2005, Dimick met with Dr. Mark Moglowsky, M.D., regarding her ulcerative colitis. Dr. Moglowsky noted that Dimick had been having "flare-ups" for the past 3 months, and was having upwards of 20 bowel movements per day. Dimick reported abdominal cramping and blood in most of her stools. Dr. Moglowsky found that Dimick was "simply not responding to therapy."[12] Dr. Moglowsky recommended Remicade infusions as treatment.

On September 21, 2005, Dimick met with Dr. Moglowsky for a follow-up appointment. Dr. Moglowsky noted that:

> Over the course of the last month on her own, [Dimick] has
> weaned herself off the PREDNISONE, so now she only takes
> the SULFASALAZINE . . . for therapy. Her bowel habit has
> improved. She is only using her bowels maybe 3 times a day.
> The stools are still loose. There is still blood in them. She
> continues to have abdominal cramping and is losing some
> weight. She told me that her family is against the
> REMICADE infusions because of the potential side effects.

---

[10] Administrative Record at 422.

[11] *Id.*

[12] *Id.* at 435.

> They are having her try some herbal therapies that she has used for the past month but do not seem to be having any effect.

(Administrative Record at 436.)

On September 27, 2005, after having visited the emergency room, Dimick returned to Dr. Moglowsky for follow-up regarding her ulcerative colitis. Dr. Moglowsky noted that over the weekend, Dimick had presented to the emergency room with uncontrolled diarrhea, abdominal pain, and rectal bleeding. A CT scan showed ulcerative colitis. At her visit, Dr. Moglowsky found Dimick noncompliant with her medication regimes, and started her on new medications for symptom relief. Dimick agreed to Remicade infusions as treatment. On October 6, 2005, Dimick had another follow-up appointment with Dr. Moglowsky. Dimick was taking both her Prednisone and Sulfasalazine, and had received one Remicade infusion. Dr. Moglowsky noted that Dimick "feels entirely better at this time. The abdominal pain has resolved. Bowel habit has returned almost to normal. There is no blood or mucus in her stool."[13] Dr. Moglowsky continued Dimick on medication and Remicade infusions as treatment.

On October 2, 2006, Dimick met with Dr. Moglowsky for a follow-up appointment. Dr. Moglowsky found Dimick's ulcerative colitis to be "under fairly good control."[14] Dr. Moglowsky noted that Dimick "is managing to perform all of her activities [of] daily living without much difficulty."[15] On October 26, 2006, Dimick returned to Dr. Moglowsky complaining of a flare-up with her ulcerative colitis. Dimick reported that she was moving her bowels up to 20 times per day. She also complained of blood in her stools and abdominal cramping. Dr. Moglowsky continued to treat her with medication.

---

[13] Administrative Record at 442.

[14] *Id.* at 478.

[15] *Id.*

12

Dimick met with Dr. Moglowsky again on November 9, 2006, with little improvement of her ulcerative colitis. Dr. Moglowsky noted that despite aggressive therapy, Dimick:

> complains of still having bowel movements 3 times an hour including some nocturnal bowel movements. There is some blood with each stool. She has cramping abdominal pain. It has caused serious destruction of her social life. She had to quit her job and quit going to school because of her bowel habits.

(Administrative Record at 484.) Dr. Moglowsky continued medication as treatment.

On March 12, 2007, at the request of Disability Determination Services ("DDS"), Dimick met with Brenna Healy, M.A., for a psychological evaluation. Healy reviewed Dimick's daily activities as follows:

> Typically, [Dimick] is up by 9:00 a.m. She immediately has to go to the bathroom and spends a significant period of time there. She is usually up three or four times during the night to use the bathroom. She showers and has breakfast and immediately has stomach pain after eating. She does housework as needed including vacuuming, dusting, laundry, and dishes. She cooks a few times a week. She drives, but only does short errands because her bathroom stops are unpredictable. She rarely goes out to eat and does not like to go to the mall because she is always interrupted by trips to the bathroom. . . . She naps almost every day and goes to bed by 9:00 p.m.

(Administrative Record at 577.) Healy further noted that Dimick "has low mood at times with crying spells and worry about her colitis but, in general, her mood is level and her anxiety is manageable."[16] Healy diagnosed Dimick with depressive disorder in remission. Healy concluded that Dimick "appears to have minor mental limitation in work related

---

[16] Administrative Record at 577.

activities. Her ulcerative colitis and associated complications appear to have the most significant impact on her ability to work."[17]

On March 31, 2007, Dr. Rene Staudacher, D.O., reviewed Dimick's medical records and provided DDS with a physical residual functional capacity ("RFC") assessment for Dimick. Dr. Staudacher determined that Dimick could: (1) occasionally lift and/or carry 50 pounds, (2) frequently lift and/or carry 25 pounds, (3) stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations. Dr. Staudacher also determined that Dimick could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. Dr. Staudacher found that Dimick should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. Dr. Staudacher found no manipulative, visual, or communicative limitations.

On April 10, 2007, Dr. Jane Bibber, Ph.D., reviewed Dimick's medical records and provided DDS with a Psychiatric Review Technique assessment for Dimick. On the assessment, Dr. Bibber diagnosed Dimick with depressive disorder. Dr. Bibber determined that Dimick had the following limitations: mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace.

On March 17, 2008, Dimick met with Dr. Brian Covey, M.D., regarding her ulcerative colitis. Dimick reported that her colitis had "been flaring the past 6 weeks with her having upwards of 7 stools per day with some bleeding noted."[18] Dr. Covey treated Dimick with medication. Dimick saw Dr. Covey again in November 2008, and stated that

---

[17] Administrative Record at 578.

[18] *Id.* at 835.

she was having 8 bowel movements per day without "much" blood in the stool. Dr. Covey prescribed new medication and encouraged Dimick to continue Remicade infusions as treatment.

On January 15, 2009, Dr. Chrystalla Daly, D.O., reviewed Dimick's medical records and provided DDS with a physical RFC assessment for Dimick. Dr. Daly determined that Dimick could: (1) occasionally lift and/or carry 20 pounds, (2) frequently lift and/or carry 10 pounds, (3) stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations. Dr. Daly also determined that Dimick should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, hazards such as machinery and heights. Dr. Daly found no postural, manipulative, visual, or communicative limitations.

On February 18, 2009, Dimick was referred by DDS to Dr. Thomas R. Anderegg, Ph.D., for a mental status evaluation. Upon examination, Dr. Anderegg diagnosed Dimick with major depressive disorder, recurrent, moderate, in partial remission and generalized anxiety disorder in partial remission. Dr. Anderegg opined that:

> Ms. Dimick is capable of remembering and understanding simple instructions, procedures, and locations. Work pace and stamina are compromised by physical difficulties. She is capable of interacting appropriately with supervisors, co-workers, and the public. Her judgment is intact. She has the ability to respond appropriately to changes in the work place.

(Administrative Record at 890.)

On February 27, 2009, Dr. Beverly Westra, Ph.D., reviewed Dimick's medical records and provided DDS with a Psychiatric Review Technique assessment for Dimick. Dr. Westra diagnosed Dimick with major depressive disorder in partial remission and generalized anxiety disorder in partial remission. Dr. Westra determined that Dimick had the following limitations: mild restriction of activities of daily living, mild difficulties in

15

maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. Dr. Westra concluded that Dimick's "[a]llegation of depression is supported, but it is well controlled with meds and causes minimal functional restrictions at this point."[19]

On June 5, 2009, Dimick met with Dr. Mirac Ince, M.D., for a second opinion of her inflammatory bowel disease. According to Dr. Ince, "[t]he major reason of the consult today is [Dimick's] unwillingness to continue Remicade for long period of time. She is a preschool teacher, gets sick frequently and these acute infections resolve slow[ly]."[20] Upon examination, Dr. Ince concluded that:

> [Dimick is a] 25-year-old female with 5-year history of inflammatory bowel disease. The disease was diagnosed by colonoscopy. . . . Her disease has been under control with Remicade for the last 4 years. She needs Remicade infusions every 7, rather than 8 weeks. . . .
>
> As she is not ready for surgery and knows well the side effects of surgery (such as fertility problems), I recommend her to continue Remicade that likely keeps the disease in remission.

(Administrative Record at 1100.) Dimick met with Dr. Ince again, on March 26, 2010. Dr. Ince opined that Dimick's "disease clinically does not look in remission. She has ups and downs with frequent bowel movements and bloody bowel movements some days and some other days abdominal pains."[21] Dr. Ince concluded that Dimick's symptoms are only partially controlled by Remicade.

---

[19] Administrative Record at 903.

[20] *Id*. at 1100.

[21] *Id*. at 1106.

# V. CONCLUSIONS OF LAW

## A. ALJ's Disability Determination

The ALJ determined that Dimick is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *Perks*, 687 F.3d at 1091-92 (discussing the five-step sequential evaluation process); *Medhaug v. Astrue*, 578 F.3d 805, 813-14 (8th Cir. 2009) (same); *see also* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In considering the steps in the five-step process, the ALJ:

> first determines if the claimant engaged in substantial gainful activity. If so, the claimant is not disabled. Second, the ALJ determines whether the claimant has a severe medical impairment that has lasted, or is expected to last, at least 12 months. Third, the ALJ considers the severity of the impairment, specifically whether it meets or equals one of the listed impairments. If the ALJ finds a severe impairment that meets the duration requirement, and meets or equals a listed impairment, then the claimant is disabled. However, the

17

> fourth step asks whether the claimant has the residual
> functional capacity to do past relevant work. If so, the
> claimant is not disabled. Fifth, the ALJ determines whether
> the claimant can perform other jobs in the economy. If so, the
> claimant is not disabled.

*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). At the fourth step, the claimant "bears the burden of demonstrating an inability to return to [his] or her past relevant work." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (citing *Steed v. Astrue*, 524 F.3d 872, 875 n.3 (8th Cir. 2008)). If the claimant meets this burden, the burden shifts to the Commissioner at step five to demonstrate that "given [the claimant's] RFC [(residual functional capacity)], age, education, and work experience, there [are] a significant number of other jobs in the national economy that [the claimant] could perform." *Brock*, 674 F.3d at 1064 (citing *Ellis v. Barnhart*, 392 F.3d 988, 993 (8th Cir. 2005)). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 416.945. The ALJ bears the responsibility for determining "'a claimant's RFC based on all the relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Boettcher v. Astrue*, 652 F.3d 860, 867 (8th Cir. 2011) (quoting *Moore*, 572 F.3d at 523); 20 C.F.R. §§ 404.1545, 416.945.

The ALJ applied the first step of the analysis and determined that Dimick had not engaged in substantial gainful activity since January 14, 2005. At the second step, the ALJ concluded from the medical evidence that Dimick had the following severe impairments: ulcerative colitis, migraine headaches, and asthma/allergies. At the third step, the ALJ found that Dimick did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Dimick's RFC as follows:

> [Dimick] has the residual functional capacity to perform the
> full range of light work . . . involving lifting twenty pounds

18

> occasionally and ten pounds frequently; occasionally balance,
> stoop, kneel, crouch, crawl, and climb; needs consistent access
> to a bathroom; no exposure to hazards or extremes of
> humidity, dust, or fumes.

(Administrative Record at 19.) Also at the fourth step, the ALJ determined that Dimick was unable to perform any of her past relevant work. At the fifth step, the ALJ determined that based on his age, education, previous work experience, and RFC, Dimick could work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded that Dimick was not disabled.

### B. Objections Raised By Claimant

Dimick argues that the ALJ erred in three respects. First Dimick argues that the ALJ failed to properly evaluate her medical treatment records, including the opinions of her treating doctors. Second, Dimick argues that the ALJ's RFC assessment is not supported by substantial evidence. Lastly, Dimick argues that the ALJ failed to properly evaluate her subjective allegations of disability.

### 1. Medical Records, Medical Opinions, and RFC Assessment

Dimick argues that in determining that she is not disabled, the ALJ failed to properly evaluate her medical records and the opinions of her treating doctors. Specifically, Dimick argues that the ALJ failed to explain his conclusions regarding her medical records and failed to give good reasons for discounting the opinions of her treating doctors. As a result of the ALJ's failure to fully and fairly develop the record as to the medical evidence in the record, Dimick maintains that the ALJ's RFC is flawed and not supported by substantial evidence. Dimick concludes that this matter should be remanded for further consideration of the record as a whole, in particular with regard to her medical records.

When an ALJ determines that a claimant is not disabled, he or she concludes that the claimant retains the residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998). The ALJ is responsible for assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803; *see also Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (same). Relevant evidence for determining a claimant's RFC includes "'medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004)). While an ALJ must consider all of the relevant evidence when determining a claimant's RFC, "the RFC is ultimately a medical question that must find at least some support in the medical evidence of record." *Casey v. Astrue*, 503 F.3d 687, 697 (8th Cir. 2007) (citing *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004)).

In considering the opinions of a treating physician, an ALJ is required to "assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence on the record." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)). "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id*. The regulations require an ALJ to give "good reasons" for giving weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). The regulations also require an ALJ to give

20

"good reasons" for rejecting statements provided by a treating physician. *Id.*; *see also Tilley v. Astrue*, 580 F.3d 675, 680 (8th Cir. 2009) ("The regulations require the ALJ to 'always give good reasons' for the weight afforded to the treating source's opinion.") (citation omitted).

Lastly, an ALJ has a duty to develop the record fully and fairly. *Cox*, 495 F.3d at 618; *Sneed v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004); *Wilcutts v. Apfel*, 143 F.3d 1134, 1137 (8th Cir. 1998). Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quoting *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994)); *see also Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) ("A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record."). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (citation omitted).

The ALJ addressed Dimick's medical records as follows:

> The objective findings in this case fail to provide strong support for [Dimick's] allegations of incapacitating symptoms and limitations. More specifically, the medical findings do not support the existence of limitations greater than the above listed residual functional capacity.
>
> A review of the longitudinal medical records revealed a history of treatment for migraines, recurrent bronchitis, sinusitis, seasonal allergies, and reactive airway disease prior to onset of symptoms related to ulcerative colitis in 2005. . . . Ulcerative colitis was diagnosed after colonoscopy with biopsies. She was placed on Prednisone but discontinued use on her own; however, symptoms were improved by March 2005 and her ulcerative colitis [was] in remission. She continued to do well until August 2005 when symptoms flared

again despite steroid therapy. Options were discussed and Remicade was recommended; however, after insurance approval [Dimick] declined stating she had weaned herself off Prednisone and was only taking Sulfasalazine with improved bowel habits of only three stools per day, some abdominal cramping, and minimal weight loss with diet. . . . Symptoms flared in September 2005 with hospital admission and she agreed to Remicade therapy which is administered by infusion every eight weeks. Colitis symptoms improved and continued to be controlled with stools only three to four times per day, good appetitive [*sic*], and stable weight. . . . In October 2006, [Dimick] reported increased stooling to about three or four per day and occasional bloody stooling. It was noted she managed to perform all of her daily activities without much difficulty and she was placed on a course of Prednisone. Upon return in November 2006, [Dimick] reported symptoms were much worse so that she had quit her job and discontinue school[.] . . . Treatment records noted a thirteen pound weight gain and Dr. Moglowsky commented that [Dimick's] appearance was not consistent with her complaints of symptoms which sounded relatively severe. Surgical options were discussed, but it was felt her condition was not severe enough to warrant surgical intervention. This opinion was supported upon evaluation by the University of Iowa Hospital surgical physicians who felt there was room for medical/conservative management. . . .

A colitis flare-up was noted in November 2008 after [Dimick] stopped taking prednisone and other oral anti-inflammatory medication on her own. She was also overdue for her next Remicade treatment. In December 2008, colonoscopy was essentially normal without evidence of active disease.

Subsequent treatment records show [Dimick] continues to receive Remicade infusions to help control symptoms of ulcerative colitis. [Dimick's] allegations of colitis flare-ups are somewhat inconsistent with those documented in the treatment records which report her symptoms are relatively stable with treatment and only three to seven stools per day,

mild abdominal discomfort, and only occasional bloody stools during flare-ups. . . . Dr. Caceres, the treating internist, indicated [Dimick] has difficult to control ulcerative colitis with Remicade therapy which makes her susceptible to infections. Dr. Caceres indicated recurrent problems with sinusitis which caused several lost work days in the past but did not opine as to restrictions. While treatment records reflect recurrent sinusitis, they are not necessarily reflective of the amount of absences alleged by [Dimick]. . . .

As for the opinion evidence, given [Dimick's] allegations of totally disabling symptoms, one might expect to see some indication in the treatment records of restrictions placed on [Dimick] by the treating doctor. Yet a review of the record in this case reveals no restrictions recommended by the treating doctor. . . .

In sum, no one doubts [Dimick] has some limitations; however, the above residual functional capacity assessment is supported by the objective medical evidence, the medical opinions when afforded appropriate weight, and [Dimick's] subjective complaints during the relevant period when taken in the proper context. In view of all the factors discussed above, the limitations on the [Dimick's] capacities which were described earlier in this decision are considered warranted, but no greater or additional limitations are justified.

(Administrative Record at 21-23.)

Having reviewed the entire record, the Court finds that the ALJ fully and fairly developed the record with regard to Dimick's medical records. *See Cox*, 495 F.3d at 618. The Court also finds that the ALJ properly considered and weighed both the opinion evidence provided by Dimick's treating sources and the medical evidence as a whole. Specifically, the ALJ explained his findings with regard to the medical evidence, and provided "good reasons" both explicitly and implicitly for the weight given to the medical evidence and the opinions of Dimick's doctors. *See* 20 C.F.R. § 404.1527(d)(2);

23

*Strongson*, 361 F.3d at 1070; *Edwards*, 314 F.3d at 967. Moreover, the record reflects that not only did the ALJ properly consider Dimick's medical records, but the ALJ also properly considered the observations of treating and non-treating physicians and Dimick's own description of her limitations in making the RFC assessment for Dimick.[22] *See Lacroix*, 465 F.3d at 887. Because the ALJ considered the medical evidence as a whole, the Court concludes that the ALJ made a proper RFC determination based on a fully and fairly developed record. *See id*. Even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

### 2. *Credibility Determination*

Dimick argues that the ALJ failed to properly evaluate her subjective allegations of disability. Dimick maintains that the ALJ's credibility determination is not supported by substantial evidence. The Commissioner argues that the ALJ properly considered Dimick's testimony, and properly evaluated the credibility of her subjective complaints.

When assessing a claimant's credibility, "[t]he [ALJ] must give full consideration to all the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) functional restrictions." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). An ALJ should also consider a "a claimant's work history and the absence of objective medical evidence to support the claimant's complaints[.]" *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (citing *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000)). The ALJ, however, may not

---

[22] *See* Administrative Record at 20-23 (providing thorough discussion of the relevant evidence for making a proper RFC determination).

24

disregard a claimant's subjective complaints "'solely because the objective medical evidence does not fully support them.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012) (quoting *Wiese v. Astrue*, 552 F.3d 728, 733 (8th Cir. 2009)).

Instead, an ALJ may discount a claimant's subjective complaints "if there are inconsistencies in the record as a whole." *Wildman*, 596 F.3d at 968; *see also Finch*, 547 F.3d at 935 (same); *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) ("The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies in the record as a whole."). If an ALJ discounts a claimant's subjective complaints, he or she is required to "'make an express credibility determination, detailing the reasons for discounting the testimony, setting forth the inconsistencies, and discussing the Polaski factors.'" *Renstrom*, 680 F.3d at 1066 (quoting *Dipple v. Astrue*, 601 F.3d 833, 837 (8th Cir. 2010)); *see also Ford*, 518 F.3d at 982 (An ALJ is "required to 'detail the reasons for discrediting the testimony and set forth the inconsistencies found.' *Lewis v. Barnhart*, 353 F.3d 642, 647 (8th Cir. 2003)."). Where an ALJ seriously considers, but for good reason explicitly discredits a claimant's subjective complaints, the Court will not disturb the ALJ's credibility determination. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996)); *see also Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (providing that deference is given to an ALJ when the ALJ explicitly discredits a claimant's testimony and gives good reason for doing so); *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003) ("If an ALJ explicitly discredits the claimant's testimony and gives good reasons for doing so, we will normally defer to the ALJ's credibility determination."). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" *Vossen v. Astrue*, 612 F.3d 1011, 1017 (8th Cir. 2010) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)).

25

In addressing Dimick's credibility, the ALJ made the following observations:

> After careful consideration of the evidence, the undersigned finds that [Dimick's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Dimick's] statements concerning the intensity, persistence and limiting effects of these symptoms are not fully credible to the extent they are inconsistent with the above residual functional capacity assessment. At one point or another in the record, either in forms completed in connection with the application, in medical records or other statements, the claimant reported activities of daily living including caring for her child; working part-time; shopping weekly up to two hours; performing regular household chores; cooking; and going out to dinner and movies. These activities are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. In comparing [Dimick's] statements and allegations with treatment records, it appears [Dimick] may tend to overstate symptoms at times. Doctors noted [Dimick's] general appearance was not consistent with her complaints of severe symptoms. No significant weight loss was noted and [Dimick] has not been treated for anemia or dehydration other than immediately post-partum. While the employer stated [Dimick] misses several days of work each month, medical records from the treating physician documented work excuses given for approximately one day per month and on occasion two days, for a total of seven work excuses during 2010. Flare-ups have generally been associated with periods of non-compliance or stopping medications on her own. Surgical intervention was not recommended and further conservative treatment was warranted. Although [Dimick] alleged frequent infections due to secondary side effects of medication for her colitis, medical records also show [Dimick] was susceptible to infection prior to the onset of colitis symptoms and was treated for frequent bronchitis, sinusitis, and seasonal allergies. When compliant with treatment and medications, symptoms appear to be stable. [Dimick] has worked part-time during the pertinent period and continues to do so. While the work activity may not be found to amount to

26

substantial gainful activity at step one of the sequential evaluation, the work activity is an indication of involvement in a range of daily activity not consistent with disability from all work. [Dimick] admitted to certain abilities that provide support for part of the residual functional capacity conclusion in this decision. Therefore, the undersigned finds [Dimick] has been less than fully credible regarding her allegation of total disability.

(Administrative Record at 22-23.)

It is clear from the ALJ's decision that he thoroughly considered and discussed Dimick's treatment history, medical history, functional restrictions, medication use, and activities of daily living in making his credibility determination. Thus, having reviewed the entire record, the Court finds that the ALJ adequately considered and addressed the *Polaski* factors in determining that Dimick's subjective allegations of disability were not credible. *See Johnson*, 240 F.3d at 1148; *see also Goff*, 421 F.3d at 791 (an ALJ is not required to explicitly discuss each *Polaski* factor, it is sufficient if the ALJ acknowledges and considers those factors before discounting a claimant's subjective complaints); *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized and considered. *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)."). Accordingly, because the ALJ seriously considered, but for good reasons explicitly discredited Dimick's subjective complaints, the Court will not disturb the ALJ's credibility determination.[23] *See Johnson*, 240 F.3d at

---

[23] Dimick takes exception to the ALJ's reasoning as to her lack of weight loss and absences from work. Specifically, Dimick argues that she did not lose weight because she was taking Prednisone, a steroid, that can cause weight gain. Dimick also argues that she missed 24 days of work between January 2010 and March 2011 due to orders from her doctor. In contrast, the ALJ found that Dimick missed 7 days of work in 2010 due to orders from her doctor. Having reviewed the entire medical record, the Court finds that the evidence shows Dimick missed 9 days of work in 2010 due to orders from her doctor,

(continued...)

27

1148. Even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

## VI. CONCLUSION

The Court finds that the ALJ fully and fairly developed the record in this matter. Specifically, the ALJ properly addressed, considered, and weighed the medical evidence and opinions in the record, including the opinions of Dimick's treating physicians. Furthermore, the ALJ properly considered Dimick's medical records, observations of treating and non-treating physicians, and Dimick's own description of her limitations in making his RFC assessment for Dimick. Lastly, the Court finds that the ALJ properly determined Dimick's credibility with regard to her subjective complaints of disability. Accordingly, the Court determines that the ALJ's decision is supported by substantial evidence and shall be affirmed.

## VII. ORDER

For the foregoing reasons, it is hereby **ORDERED**:

1. The final decision of the Commissioner of Social Security is **AFFIRMED**;

2. Plaintiff's Complaint (docket number 4) is **DISMISSED** with prejudice; and

---

[23](...continued)
and 8 days of work in the first part of 2011 based on orders from her doctor, for a grand total of 17 days. While neither Dimick, nor the ALJ correctly determined the number of days Dimick missed due to orders from her doctor, the Court does not find that such determinations detract from the ALJ's overall credibility assessment. Similarly, while Dr. Moglowsky in August 2005 indicated that Dimick might have gained some weight on Prednisone, Dimick did not consistently use Prednisone, and there is no other evidence in the record discussing weight gain based on Prednisone. Again, the Court concludes that Dimick's argument with regard to weight gain and the use of Prednisone does not detract from the ALJ's overall credibility determination.

3.    The Clerk of Court is directed to enter judgment accordingly.

DATED this _20th_ day of March, 2013.

_____
JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA